# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Pamela Campbell, individually
and as Next Friend of Jane Doe,

        Case No. 12-cv-12327

    Plaintiff,  Hon. Judith E. Levy

        Mag. Judge David R. Grand

v.

Dundee Community Schools,
Richard Alan Neff, Bruce Nelson,
Aaron Carner, and West
Educational Leasing,

    Defendants.

_____/

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS DUNDEE COMMUNITY SCHOOLS, BRUCE NELSON, AND AARON CARNER'S MOTION FOR SUMMARY JUDGMENT [39], GRANTING WEST EDUCATIONAL LEASING'S MOTION FOR SUMMARY JUDGMENT [41], AND DISMISSING WITHOUT PREJUDICE <u>ALL REMAINING CLAIMS</u>

This case presents disturbing facts regarding a young girl whose life was inalterably changed and damaged by an adult basketball coach at her middle school.   School should be a safe, nurturing, and positive environment for children.  This was not the case for Jane Doe, and as a result, her mother sued the school and its administrators.  Doe was the

victim of repeated sexual abuse in 2009 and 2010 by defendant Richard Alan Neff, her school basketball coach. In 2010, Neff was tried and convicted of accosting a child for immoral purposes and criminal sexual conduct in the first and second degree, and is currently serving a minimum of 15 years in the custody of the Michigan Department of Corrections. Neff refused to be deposed for this case.

Pending are defendants Dundee Community Schools, Bruce Nelson, and Aaron Carner's motion for summary judgment (Dkt. 39) and defendant West Educational Leasing's motion for summary judgment. (Dkt. 41.)

I.    Background

From 2001 until 2010, Dundee Community Schools ("DCS") employed Neff as a middle school girls' basketball coach. In January 2009, Doe was a twelve-year-old student at Dundee Middle School, and she joined the basketball team. Neff began texting Doe, along with other student players, after she joined the team. The parties agree that the texting began as a series of practical, non-sexual messages reflecting communications between the students and their coach. As the 2009 season ended in spring of that year, Neff texted Doe more

2

frequently, but the texts still lacked a sexual or otherwise intimate tone or purpose.

Around the end of June 2009, Neff began calling Doe on the telephone. He also began watching sports at Doe's home with her father, who was one of the team's assistant coaches. Near the end of the summer, Neff kissed Doe on the cheek. In the fall of 2009, Neff began visiting Doe's house before he went to work. Doe would sneak out of her home to speak with him. During these encounters, Neff would hug, kiss, and touch Doe. In November and December of 2009, Neff's texting with Doe became sexual in nature, and Neff began sneaking into Doe's home to visit her during her winter break. During this period, Neff instructed Doe not to tell anyone about these encounters and his abuse of her.

At the beginning of 2010, West Educational Leasing, doing business as Professional Contract Management, Inc. ("PMCI"), contracted with DCS to take over employment of the district's entire athletic department. Pursuant to the contract, PMCI required Neff to undergo a criminal background check, but did not interview him in person. (Dkt. 41-9.) The background check did not turn up any

criminal convictions or other indication of prior criminal activity. Nelson, the superintendent of the school district, also certified that no documentation of unprofessional conduct existed in Neff's personnel file. (Dkt. 41-7.)

Neff and Doe continued to text when the 2010 basketball season began. The team also took bus rides to games, and during those rides, Neff would sit in the back of the team bus with Doe. On at least one occasion, Neff engaged in sexual contact with Doe while sitting with her on the bus. Aaron Carner, the district's athletic director, heard complaints about Neff sitting with Doe in the back of the bus, which came to him either through communications with parents, or from the bus driver. None of these complaints indicated that Neff was having sexual contact with Doe on the bus or anywhere else. Carner discussed the complaints with Neff, and told him to stop sitting in the back of the bus with students. (Dkt. 48-9 at 4.) Carner's concern "was more to protect [Neff] at the time." (Id.) Carner also stated during Neff's criminal trial that he was contacted by various parents who complained that Neff was calling and texting other girls on the team. (Id. at 5.)

Jessica Burd, a parent of another student on the basketball team, alerted the school to concerns about Neff and Doe's relationship between January and March of 2010.  (*See* Dkt. 50-1.)  Burd's concerns were based on her daughter's reports that Neff favored Doe during practice.  (Id. at 4.)  Burd discussed with the vice principal of the school what she, other parents, and other students on the basketball team perceived as Doe's "crush" or infatuation with Neff.  (Dkt. 48-27 at 16-17.)  Burd also confronted Neff directly about the perceived infatuation, and Neff told Burd that "he was going to try to back off and not be such a father figure for [Doe]."  (Id. at 17.)

Burd, however, did not see Neff "touch [Doe] inappropriately besides maybe the good job pat on the back type thing."  (Dkt. 50-1 at 5.)  Burd also did not see Doe's crush "reciprocated besides [Neff] being nice to her."  (Dkt. 48-17 at 20.)

On April 23, 2010, a school custodian, Robert Kominek, caught Neff with Doe in a custodian's closet engaging in sexual contact. Kominek had seen Neff alone with Doe "five to eight times" previously, but he testified that he did not see them engage in intimate contact on those occasions.  (Dkt. 47-1 at 3.)

5

Kominek immediately called Carner to report what he had seen in the closet. Carner then called Nelson, who instructed Carner to call both the police and Child Protective Services. Carner did so. (Dkt. 57 at 23.)

Neff was arrested, prosecuted, and convicted of criminal sexual conduct in the first and second degree and accosting a child for immoral purposes in Michigan state court. He is currently incarcerated, and has not been employed by DCS since 2010.

Plaintiffs filed suit against defendants on May 29, 2012, bringing the following claims against the following parties: (1) battery against Neff; (2) discrimination on the basis of sex in violation of Title IX, 20 U.S.C. § 1681, as to DCS, Nelson, Carner, and PMCI; (3) violation of plaintiff's equal protection rights under the Fourteenth Amendment as to DCS, Nelson, and Carner; (4) violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.101 *et seq.*, as to DCS, Nelson, Carner, and PMCI; (5) negligent hiring as to PMCI; (6) violation of M.C.L. § 722.621 *et seq.* as to DCS, Nelson, and Carner; (7) intentional and negligent infliction of emotional distress against Neff; (8) vicarious

6

liability against DCS; and (9) loss of consortium by Pamela Campbell as to all parties.[1]

DCS, Nelson, and Carner moved for summary judgment on September 29, 2014. (Dkt. 39.) PMCI moved for summary judgment on September 30, 2014. (Dkt. 41.) Oral argument was held on the motions on March 4, 2015. On March 19, 2015, the Court issued an order permitting defendants to depose Elizabeth Mossoian, a witness on whom plaintiffs relied in their responsive briefing. (Dkt. 54.) That order also permitted the parties to file supplemental briefing regarding whether Mossoian's testimony revealed that Carner had actual knowledge that Neff was having sexual contact with Doe prior to the incident that led to his discharge from employment and prosecution. The parties filed supplemental briefing regarding her deposition and its impact on this case on May 4, 2015. (Dkts. 55-57.)

II.    Legal Standard

---

[1] Plaintiffs initially pled several of their claims against all defendants, but clarified which claims were against which defendants at oral argument. Plaintiffs also indicated at oral argument that the gross negligence claim against all defendants was intended to be a negligent hiring claim against PMCI only.

7

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248. The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002)).

III.   Analysis

The Court will first address plaintiffs' claims under federal law, then plaintiffs' claims under state law. Because defendant Neff has not appeared and has filed no dispositive motion in this matter, the Court will not address the claims against him.

A.   Title IX of the Civil Rights Act of 1964

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or

8

activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).

Title IX contains an implied private right of action for monetary

damages. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 280-81

(1998) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)).

A Title IX action may be brought regarding the sexual harassment

or abuse of a student. *Williams ex rel. Hart v. Paint Valley Local Sch.

Dist.*, 400 F.3d 360, 363 (6th Cir. 2005).  Such an action requires

plaintiffs to show that (1) an act of abuse or harassment occurred; (2) a

school official with sufficient authority had actual notice that the abuser

posed a substantial risk of abuse to students, and (3) the school district

was deliberately indifferent to that substantial risk. *Gebser*, 524 U.S.

at 285.  Plaintiffs claim that DCS, Nelson, Carner, and PMCI violated

Title IX by virtue of their roles in the abuse Doe suffered at the hands of

Neff.

Title IX does not permit individual liability for sexual harassment,

however, as individuals are not recipients of federal funds. *Soper v.

Hoben*, 195 F.3d 845, 854 (6th Cir. 1999).  Under the same principle,

PMCI cannot be held liable under Title IX, as there is no allegation or

evidence that it is a recipient of federal funds.  Accordingly, the Title IX

9

claim is dismissed against Nelson, Carner, and PMCI, and may only proceed against DCS.

The parties do not contest the first prong of Title IX: Neff undeniably abused Doe. Instead, DCS argues that it did not have actual notice of the substantial risk of abuse that Neff posed to students, and that it was not deliberately indifferent to that risk.

i.      Actual Notice of a Substantial Risk of Abuse

To show that DCS had actual notice of a substantial risk of abuse under Title IX, plaintiffs must show at a minimum that an "appropriate person" had notice of such risk, along with "an opportunity to rectify any violation[.]" *Gebser*, 524 U.S. at 290. "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id*.

Plaintiffs allege that both Nelson and Carner were appropriate persons under Title IX. For the purposes of summary judgment, plaintiffs have presented enough evidence to show that either Nelson or Carner could have or did have the authority to take corrective action if either had notice of a substantial risk of abuse.

10

Plaintiffs point to Nelson and Carner's knowledge of the following incidents as evidence of notice of a substantial risk of abuse: (1) Neff's sitting in the back of the bus with the girls on the team and (2) Neff's texting and calling the girls, including Doe. Plaintiffs rely on a variety of cases where school officials had prior knowledge of harassment or abuse, but were alleged to have taken no corrective action to address or prevent such abuse. *See, e.g.*, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000); *Patterson v. Hudson Area Schs.*, 551 F.3d 438 (6th Cir. 2009).

In Title IX cases, a plaintiff must show more than that the defendant was on notice of some form of inappropriate behavior. In *Gebser*, the Supreme Court found that under an "actual notice" standard, complaints from parents concerning inappropriate comments by a teacher during class were "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." *Id.* at 291. Similar to this case, the teacher in *Gebser* spent substantial amounts of time alone with the student he harassed on school grounds, inappropriately communicated with both his victim and other students, and engaged in an illegal

11

sexual relationship with his victim after visiting her home.  *Id.* at 277-78.  The teacher in *Gebser* was likewise terminated from his job and arrested for his crimes.  *Id*. at 278.  In *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479 (6th Cir. 2006), the Sixth Circuit found that a teacher's "communications at odd hours, inappropriate counseling, unchaperoned off-campus activities and inappropriate interactions with team members" did not "hint[] at the existence of a hostile environment."  *Id.* at 490.

Where courts have found that actual notice of a substantial risk of abuse existed, it has been where the defendant or an appropriate person was on notice of a substantial risk of the actual *type* of abuse that would give rise to Title IX liability.  In *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 654 (1999), the Supreme Court found that actual notice existed where the school principal was aware of multiple complaints of harassment by other students that were similar to the harassment experienced by plaintiff, and where both parent and student made repeated harassment complaints to the teacher and principal.  In *Vance*, 231 F.3d at 259, the Sixth Circuit, following *Davis*, found that actual notice existed where the parent and student made

12

repeated reports to the district, teachers, and principals, and filed a Title IX complaint with the school.  Likewise, in *Thorpe v. Breathitt Cnty. Bd. Of Educ.*, 8 F. Supp. 3d 932 (E.D. Ky. 2014), the court found that actual notice existed where the parents of the abused student spoke with the principal about numerous texts between a teacher and their daughter, and raised concerns that the teacher was a "sick pervert" and that the teacher would end up "raping somebody."  *Id*. at 944.

Viewed in the light most favorable to plaintiff, Nelson and Carner were aware of, at most, the fact that Neff was inappropriately texting and calling Doe and sitting with her in the back of the bus.  The "actual notice" standard set forth in *Gebser* requires more than the knowledge that *some kind* of inappropriate behavior is occurring.  It requires actual knowledge that there is a substantial risk of abuse that would give rise to liability under Title IX.  The dissent in *Gebser* criticizes this standard, *Gebser*, 524 U.S. at 298-306 (Stevens, J. dissenting), and although the Court finds the dissent's analysis convincing, it is not the law.

13

Plaintiffs argue that Carner had notice that Neff was inappropriately sitting with Doe in the back of the team bus. The evidence presented regarding those incidents indicates that the complaints Carner received, whether from parents or the bus driver, were concerned with the inappropriateness of Neff sitting with Doe on the bus, without any insinuation or allegation that sexual abuse was occurring. No allegations were made to Carner or Nelson that Neff was actually engaged in abuse or harassment while sitting with Doe on the bus.

Plaintiffs rely on Carner's statement that he "thought [he] felt like [Neff was] putting himself in a situation that was not good for him as far as sitting in the back of the bus as – in the dark with kids, more importantly, girls." (Dkt. 48-9 at 5.) This statement, plaintiffs argue, shows that Carner was on notice of a substantial risk that Neff was abusing Doe. As plaintiffs also indicate, Carner's worry was not that Neff was abusing Doe, but instead that Neff could (in Carner's mind) be wrongly perceived to be doing something inappropriate with Doe. However, the statement alone, without more, shows only that Carner was aware of a risk that Neff's actions would appear inappropriate to

14

observers, not that Carner was aware of a risk that Neff might sexually abuse Doe.  Under current law, the "substantial risk of abuse" standard is not satisfied by an appropriate person's knowledge that a situation exists in which a teacher could theoretically abuse a student, absent knowledge that there is a substantial risk that abuse will or could actually occur.

Plaintiffs also argue that Carner and Nelson had actual notice of a substantial risk of abuse based on complaints received from parents both about Neff calling and texting students, and about his behavior toward Doe during basketball games.   Plaintiffs reference the declaration and deposition of Jessica Burd, a parent of another student on the team.   In her declaration, Burd stated that she noticed Neff "hanging around" with Doe and that she called the vice principal of the middle school to complain about the relationship between Neff and Doe.  (Dkt. 48-12 at 3-4.)   At her deposition, Burd stated that her worries were that Doe appeared to have "a crush" on Neff, and that "Neff wasn't doing enough to stop the situation."   (Dkt. 48-27 at 16, 20.)   She also stated that she believed that Neff's inappropriate conduct consisted of it

being "inappropriate for him to allow her to continue that fascination with him." (Id. at 25.)

Burd's declaration and testimony do not establish that either Carner or Nelson had actual knowledge of a substantial risk of abuse by Neff based on complaints about Neff calling and texting Doe, or his behavior with her during basketball games. The complaints that plaintiffs reference alerted the school's vice principal to inappropriate behavior and/or inappropriate handling of a situation involving a student by Neff, but knowledge of that behavior did not constitute actual notice of a substantial risk of abuse by Carner or Nelson.

Finally, plaintiffs rely on the declaration and deposition testimony of Elizabeth Mossoian, Carner's ex-wife, to argue that Carner had actual knowledge of a substantial risk that Neff was abusing Doe. In her declaration, Mossoian stated that on April 23, 2010, when Carner received the call from Kominek, Carner stated "words to the effect of, 'I already talked to him [Neff] about this," and 'I told him [Neff] not to do that,' and 'why is he still doing this?'" (Dkt. 3 at 3.) The declaration then stated that the "this" and "that" Carner referred to was Neff sitting in the back of the bus with Doe. (Id.)

16

At her deposition, Mossoian stated that neither she nor her daughter, who was on the basketball team with Doe, had any idea that Neff "had done something physically inappropriate in the back of the bus[.]" (Dkt. 56-2 at 29.) Additionally, Mossoian stated that Carner never told her that he was aware of Neff having physically touched Doe on the back of the bus, and that she was not aware that Carner had any knowledge of Neff having done so as of April 23, 2010. (Id. at 29-30.)

Mossoian's recollection of Carner's statements shows that Carner, with hindsight, connected Neff's sitting with Doe in the back of the bus with Neff hiding in a closet and having sexual contact with Doe. Mossoian's declaration and testimony do not, however, establish that Carner had actual knowledge of a substantial risk of abuse by Neff before April 23, 2010.[2]

Plaintiffs have shown that Carner knew that Neff was sitting with Doe on the back of a bus on more than one occasion – and that Carner addressed that with Neff, but did not suspect that Neff was molesting Doe on the bus. Plaintiffs have shown that Carner knew that Neff was

---

[2] Defendants Carner, Nelson, and DCS object to the admissibility of Mossoian's testimony at trial, due to spousal privilege. However, because the Court will dismiss all claims in this action, the admissibility of her testimony at trial is not at issue.

inappropriately texting and calling Doe, and treating her with what they referred to as favoritism during practices and games – but not that Carner knew or had reason to suspect that Neff's contact with Doe extended beyond those actions.  Further, plaintiffs have not shown that any other students complained to DCS, such that "an appropriate official [had] actual knowledge of a substantial risk of abuse to students based on prior complaints by other students."  *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003).[3]

The Supreme Court has set a very high bar for plaintiffs who seek to hold school districts liable for the sexual misconduct of their employees.  Although plaintiffs in this case have evidence to show Neff was acting inappropriately with Doe, and that a responsible official had notice of some inappropriate behavior, they have failed to show that DCS had actual knowledge of a substantial risk of Neff abusing Doe.

ii.    Deliberate Indifference

---

[3] Plaintiffs also reference an incident in which a teacher, Lee Haselschwerdt, gave Neff a key to the gym's press box while Doe was accompanying Neff.  Neff stated that the reason he needed the key was to get a scoreboard locked in the room.  (Dkt. 48-6 at 4.)  Unknown to Haselschwerdt, Neff molested Doe in the press box after obtaining the key.  (Id.; Dkt. 47 at 9.)  Plaintiffs do not argue, however, that Carner or Nelson were aware of this incident prior to April 23, 2010.

18

A Title IX federal assistance recipient is liable where the recipient "itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance*, 231 F.3d at 260. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo harassment or make them liable or vulnerable' to it." *Id*. (quoting *Davis,* 526 U.S. at 645).

"[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id*. (citing *Davis,* 526 U.S. at 648). However, "[t]he recipient is not required to 'remedy' sexual harassment nor ensure that students conform their conduct to certain rules, but rather, 'the recipient must merely respond to known . . . harassment in a manner that is not clearly unreasonable.'" *Id*. (citing *Davis,* 526 U.S. at 648-49).

It is insufficient to simply investigate and do nothing more in response to an allegation of abuse. *Id.* However, the district must have actual knowledge of the abuse in order to be liable for remedying it. *Patterson*, 551 F.3d at 452. Here, DCS, through Nelson and Carner, had actual knowledge of Neff texting and calling Doe, and sitting in the

back of the bus with her.  Carner addressed these issues with Neff and reprimanded him.  Plaintiffs do not argue that other incidents came to the school's attention between the reprimand and the April 23, 2010 incident, or that Carner had actual knowledge that Neff was sexually assaulting or abusing Doe.

If the school district had actual knowledge of acts of harassment, and its efforts to address those acts were ineffective, then the district would have "failed to act reasonably in light of the known circumstances." *Vance*, 231 F.3d at 261.  Plaintiffs allege primarily that DCS' Title IX compliance measures and training were poorly done, and that Carner and Nelson "had opportunities to stop Neff but consciously did not."  (Dkt. 47 at 16-17.)

Plaintiffs have not shown that DCS had knowledge of any acts of molestation or sexual abuse by Neff.  Plaintiffs argue that the acts of which DCS and/or Carner and Nelson were aware – namely, the times Neff sat with Doe on the bus – themselves constitute the sort of harassment or abuse that could have given rise to liability under Title IX, and that DCS failed to act reasonably in response to those acts.

20

To the extent plaintiffs argue that the known acts Neff engaged in were not handled reasonably, that argument rests on Carner's handling of Neff's actions through informal reprimand and discussion. Plaintiffs contend that Carner and Nelson should have created a more extensive written record of Neff's conduct, and should have called Doe's parents or other players' parents about his conduct.

At the time of the reprimand, Carner and Nelson knew that Neff was sitting in the back of the bus with Doe on trips to and from basketball games. Carner's primary worry was that Neff's actions would make him seem as if he could be engaged in further inappropriate behavior, and he spoke to Neff in order to instruct him to stop. Plaintiffs do not point to any other knowledge Carner had at the time that would require a different or more formal response. In this circumstance, when a supervisor is aware only that a coach is sitting with a student on a bus, but the supervisor has no indication that any abusive or harassing behavior could have or did happen while the coach was doing so, a verbal reprimand and instruction to cease sitting in that area of the bus is not clearly unreasonable.

Plaintiffs also argue that DCS had the responsibility to enforce rules against students texting and calling during the school day, as Neff did Doe. However, plaintiffs do not establish that DCS knew of the texting and calling during the school day. "[T]he school district is not responsible for failing to stop harassment of which it was not made aware[.]" *Patterson*, 551 F.3d at 452. Moreover, whether or not Doe was texting or making and receiving phone calls during the school day has little to do with establishing Carner and Nelson's knowledge of Neff's abuse.

Finally, plaintiffs argue that the school's policy requiring guardians to designate who was allowed to pick up a child after school was violated with no response from DCS when Neff was allowed to stay with Doe after school hours on school property. The policy plaintiffs reference concerned the proper identification of adults permitted to take a child off of school property. By its very definition, a school employee staying with a child on school property is not within the scope of this policy. Furthermore, plaintiffs do not argue that a coach or teacher spending time with a student after school by itself constitutes an act of harassment or abuse, or that DCS was aware of any acts of harassment

or abuse by Neff while he spent time with Doe on school grounds until April 23, 2010.

Plaintiffs have not shown that DCS was deliberately indifferent to known acts of harassment or abuse by Neff.

### B.    Equal Protection – Fourteenth Amendment

Plaintiffs argue that Nelson, Carner, and DCS are liable through § 1983 for violation of Doe's right to personal security and bodily integrity. *See Doe v. Claiborne Cnty.*, 103 F.3d 495, 506-607 (6th Cir. 1996) (citing *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).

### i.    Municipal Liability

To succeed on a municipal liability claim, plaintiffs must show (1) they have asserted the deprivation of a constitutional right; and (2) that DCS is responsible for that violation. *Claiborne*, 103 F.3d at 505-06. Doe has asserted a constitutional right to be free from sexual abuse at the hands of a public school employee. Under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), plaintiffs must establish either that "an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a

23

constitutionally protected right." *Claiborne*, 103 F.3d at 507 (citing *Monell*, 436 U.S. at 690-91).

Plaintiffs allege that Nelson "was responsible for implementing policies adopted by the Dundee Community Schools Board." (Dkt. 47 at 27.)  However, plaintiffs do not allege any policy or custom that DCS adopted that would give rise to municipal liability.  Plaintiffs allege that, because the Title IX policy at the school was a "sham," DCS had a "policy of ignorance" that led to the deprivation of her rights   (Id.)

Accordingly, plaintiff is alleging that DCS failed to adopt or maintain policies that would have protected the constitutional rights of students to be free from abuse.  To prove that a custom consists of a failure to adopt or maintain policies, a plaintiff must show:

> (1) the existence of a clear and persistent pattern of sexual abuse by school employees;
>
> (2) notice or constructive notice on the part of the School Board;
>
> (3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Claiborne*, 103 F.3d at 508.

First, plaintiffs have not shown a clear and persistent pattern of sexual abuse by school employees. They have shown that one employee abused one student, and when he was discovered, he was terminated from his employment and prosecuted. A plaintiff cannot succeed on a § 1983 claim against a municipality based solely on her own abuse. *See Swanson v. Livingston Cnty.*, 121 Fed. Appx. 80, 85 (6th Cir. 2005) (denying § 1983 claim where plaintiff failed to identify "a single incident of alleged harassment against any individual but herself"); *cf. Doe v. Warren Consol. Schs.*, 307 F. Supp. 2d 860, 887 (6th Cir. 2003) (permitting claim to go forward where a teacher engaged in abuse on a consistent basis against multiple students between 1984 and 1998).

Second, plaintiffs have not shown any notice or constructive notice of any abuse on the part of the DCS Board. Instead, plaintiffs conflate Nelson with the DCS Board, and contend that Nelson was required to institute policies that would have prevented sexual harassment and abuse, that his failure to do so "amount[ed] to the establishment of a

25

policy of ignoring credible signs of endangerment of the schoolchildren," and that the DCS Board is somehow liable for Nelson's failure to do so. (Dkt. 47 at 27.)   Nelson's purported failure to institute a policy does not give the DCS Board notice or constructive notice of abuse.

Third, plaintiffs do not allege that DCS tacitly approved of Neff's behavior.   They allege that DCS did not conduct sufficient Title IX training, but do not state how that would lead to tacit approval of abuse.

Accordingly, plaintiff's equal protection claim against DCS is dismissed.

### ii.    Nelson and Carner

To prove individual supervisory liability under § 1983, liability is appropriate only where "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it, or at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary v. Daeschner,* 349 F.3d 888, 903 (6th Cir.2003) (citations and internal quotation marks omitted).   Liability "must be based on more than the

right to control employees. Likewise, simple awareness of employees' misconduct does not lead to supervisor liability." *Id.*

In the school context, a "plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students." *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2004). In other words, the plaintiff must show that the "defendants' conduct amounted to a tacit authorization of the abuse." *Claiborne*, 103 F.3d at 513 (further citation omitted).

"[L]iability must be based on active unconstitutional behavior, and . . . a mere failure to act [is] not sufficient." *Roseville*, 296 F.3d at 440. Plaintiffs' § 1983 claim is based on "Nelson and Carner's deliberate inaction." (Dkt. 47 at 26.) Plaintiffs allege that Nelson and Carner were aware of Neff's behavior in this single instance, and did nothing to stop it. As a result, plaintiffs have alleged no active unconstitutional behavior on the part of either Nelson or Carner. This claim is further undercut by the fact that Carner, at Nelson's instruction, called the

27

police on April 23, 2010, which led to Neff's prosecution and imprisonment.

Accordingly, plaintiffs' equal protection supervisory liability claim must be dismissed.

> ### C.   State Law Claims

Plaintiffs assert a variety of state law claims against DCS, Nelson, Carner and PMCI. As a threshold matter, DCS, Nelson, and Carner claim varying forms of immunity from plaintiffs' claims.

Michigan's Governmental Tort Liability Act (GTLA) extends immunity to governmental agencies and employees or agents of governmental agencies. M.C.L. § 691.1407. "Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Id. at (1). The only exceptions to governmental agency immunity are (1) maintenance of public highways, M.C.L. § 691.1402; (2) negligent operation of a government-owned motor vehicle, M.C.L. § 691.1405; (3) public building defects, M.C.L. § 691.1406; (4) performance of proprietary functions by government entities, M.C.L. § 691.1413; (5) medical care or treatment

provided to a patient, M.C.L. § 691.1407(4); and (6) sewage disposal system events, M.C.L. § 691.1417.  None of these exceptions apply to plaintiffs' claims.

Superintendents of schools are the "highest appointive executive official" of a school district, and a superintendent is entitled to absolute immunity "if he or she is acting within the scope of his or her . . . executive authority."   M.C.L. § 691.1407(5); *see also Nalepa v. Plymouth-Canton Cmty. Sch. Dist.*, 207 Mich. App. 580, 586-87 (1994).

Other governmental employees and agents are immune from tort liability if they (a) are acting or reasonably believe they are acting within the scope of their authority; (b) the governmental agency for which they work is engaged in the exercise or discharge of a governmental function; and (c) the officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.  M.C.L. § 691.1407(2).

Michigan courts read "the proximate cause" to require that the cause be "the one most immediate, efficient, and direct cause preceding an injury."  *Robinson v. City of Detroit*, 462 Mich. 439, 459 (2000). "Ordinarily, the determination of proximate cause is left to the trier of

fact, but if reasonable minds could not differ regarding the proximate cause of the plaintiff's injury, the court should rule as a matter of law." *Babula v. Robertson,* 212 Mich. App. 45, 54 (1995).

In *Miller v. Lord*, 262 Mich. App. 640 (2004) and *Gray v. Cry*, 2011 WL 4375074 (Mich. App. Sept. 20, 2011), the Michigan Court of Appeals applied this proximate cause standard to the school setting. The *Miller* court held that even gross negligence by teachers that resulted in the sexual assault of one student by another student was not *the* proximate cause of the student's injuries, as the student rapist was the actual proximate cause. *Miller*, 262 Mich. App. at 644.

Likewise, in *Gray*, the Michigan Court of Appeals found that a teacher who encouraged students to fight in a school weight room was not *the* proximate cause of a student's injuries, as the other student in the fight was the most immediate, efficient, and direct cause preceding an injury. *Gray,* 2011 WL 4375074, at *3.

iii.    Elliot Larsen Civil Rights Act ("ELCRA")

Plaintiffs assert that DCS, Nelson, Carner, and PMCI violated ELCRA, M.C.L. § 37.2402(a), which prohibits discrimination by an educational institution "against an individual in the full utilization of or

benefit from the institution, or the services, activities, or programs provided by the institution because of . . . sex." Educational institution "means a public or private institution, or a separate school or department thereof, and includes an academy, college, elementary or secondary school, extension course, kindergarten, nursery, local school system, university, or a business, nursing, professional, secretarial, technical, or vocational school; and includes an agent of an educational institution." M.C.L. § 37.2401.

DCS, Nelson, and Carner argue only that they are generally immune from plaintiffs' ELCRA claim, and do not address the substance of the claim. However, ELCRA clearly contemplates liability on the part of an educational institution and permits an action against an educational institution and its agents. M.C.L. § 37.2801; *see also Manning v. Hazel Park*, 202 Mich. App. 685, 699 (1993).

Accordingly, plaintiffs' ELCRA claim will not be dismissed as to DCS, Nelson, and Carner.

Plaintiffs also allege in their complaint that PMCI violated ELCRA. However, plaintiffs provide no response to PMCI's argument that plaintiffs have provided no evidence showing that PMCI committed

31

any act that could give rise to liability under ELCRA. Plaintiffs' response to the motions for summary judgment mentions only DCS, Nelson, and Carner with regard to ELCRA, and does not reference or include any evidence that would give rise to an inference of liability for PMCI under this claim.

Accordingly, the ELCRA claim against PMCI is dismissed.

### iv.   Negligent Hiring

Plaintiffs allege that PMCI engaged in negligent hiring by failing to interview Neff face-to-face and ask him about any inappropriate conduct he may have been involved in, even if not disclosed in his personnel file.

To establish negligence, a plaintiff must establish (1) a duty; (2) a breach of that duty; (3) proximate causation; and (4) damages. *Brown v. Brown*, 478 Mich. 545, 552 (2007).

"Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Id*. (further citation omitted). Although plaintiffs allege that PMCI had a duty to interview Neff in person, they cite no basis in law to establish

that duty.  The Court can find no support for the contention that an agent taking over administrative employment duties for a school district must conduct an in-person interview of an employee who has worked for the district for nine years and for whom the agent has already conducted a criminal background check and personnel file review.

Accordingly, this claim is dismissed.

> v.     Mandatory Reporting – M.C.L. § 722.621 *et seq*.

The Michigan Child Protection Law ("CPL"), M.C.L. § 722.621 *et seq.*, makes certain individuals mandatory reporters of child abuse to Michigan's Child Protective Services.   Among them are school administrators and school counselors or teachers.   M.C.L. § 722.623(1)(a).  Mandatory reporters "who [have] reasonable cause to suspect child abuse or neglect shall make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of suspected child abuse or neglect to the department.  Within seventy-two hours after making the oral report, the reporting person shall file a written report as required in this act."  Id.  "A person who is required by this act to report an instance of suspected child abuse or neglect and

who fails to do so is civilly liable for the damages proximately caused by the failure." M.C.L. § 722.633(1).

The Michigan Court of Appeals has held that the CPL does not abrogate GTLA immunity, because the GTLA was later-enacted. *Jones v. Bitner*, 300 Mich. App. 65, 77 (2013). Accordingly, DCS and Nelson are absolutely immune from liability under this statute, and Carner will have immunity unless his conduct amounts to gross negligence that is the proximate cause of the injury or damage.

Under the CPL, "in order for [a governmental] defendant to be liable under the mandatory reporting statute, [his or] her conduct must have been grossly negligent and *the* proximate cause." *Id.* (emphasis in original). Where a child is abused by a third party, the third party is *the* proximate cause, and the governmental employee will not be held liable. *Id.* at 78. Here, because Neff abused Doe, he is the proximate cause of her injuries, and so Carner may not be held liable under the CPL.[4]

---

[4] Plaintiffs also contend that Nelson and Carner were liable even if Carner called and filed a written report in compliance with the CPL on or around April 23, 2010, because the duty to report arose at some point before that based on their knowledge of Neff's behavior. However,

Accordingly, this claim is dismissed.

> vi.    Vicarious Liability

Plaintiffs allege that DCS is vicariously liable for the acts of Nelson, Carner, and Neff.

A governmental entity cannot be held liable for the intentional torts of its employees.    *Payton v. Detroit,* 211 Mich. App. 375, 393 (1995) (citing *Alexander v. Riccinto,* 192 Mich. App. 65, 71-72 (1991)). Plaintiffs list a variety of state law claims against the various defendants, but only one is not an intentional tort: negligent infliction of emotional distress as to Neff.

Accordingly, this claim must be dismissed in its entirety, except as to the negligent infliction of emotional distress claim.

> vii.    Loss of Consortium

Plaintiff Pamela Sue Campbell asserts a loss of consortium claim as to her daughter.  DCS, Nelson, and Carner do not mention this claim in their briefs, except that they generally claim immunity from state law tort claims.    The Michigan Supreme Court has held that governmental immunity applies to loss of consortium claims, which are

---

Nelson would still have absolute immunity, and Carner would be immune because he was not the proximate cause of Doe's injuries.

independent, if derivative, causes of action. *Wesche v. Mecosta Cnty. Road Com'n*, 480 Mich. 75, 83-84 (2008).

Plaintiffs do not argue that any of the exceptions to DCS' or Nelson's immunity apply, nor do they argue that Carner was the proximate cause of the damages arising from the alleged loss of consortium. Accordingly, this claim is dismissed.

D.    Dismissal of Remaining Claims

The following claims remain: violation of ELCRA as to DCS, Nelson, Carner, and Neff, vicarious liability for Neff's negligent infliction of emotional distress as to DCS, and claims for battery, intentional and negligent infliction of emotional distress, and loss of consortium as to Neff.

No federal claims remain in this case, and diversity does not exist between the parties, as all parties are either residents or political subdivisions of Michigan. The Court cannot exercise supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(a), and must therefore dismiss them without prejudice so that plaintiffs may refile them in state court.

IV.   Conclusion

For the reasons set forth above, it is hereby ordered that:

Defendants DCS, Nelson, and Carner's motion for summary judgment (Dkt. 39) is GRANTED IN PART as to plaintiffs' claims for violation of Title IX of the Civil Rights Act of 1964, violation of equal protection under the Fourteenth Amendment,  failure to comply with M.C.L. § 722.621 *et seq.*, vicarious liability except as to the negligent infliction of emotional distress claim, and loss of consortium, and DENIED IN PART as to plaintiffs' claims for violation of the Elliott-Larsen Civil Rights Act, and vicarious liability on the part of DCS for Neff's negligent infliction of emotional distress;

Defendant PMCI's motion for summary judgment (Dkt. 41) is GRANTED;

All remaining claims in this case are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction; and

This case is DISMISSED.

IT IS SO ORDERED.

Dated: July 1, 2015                        s/Judith E. Levy
Ann Arbor, Michigan                  JUDITH E. LEVY
                                                   United States District Judge

37

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 1, 2015.


s/Felicia M. Moses
FELICIA M. MOSES
Case Manager